IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: _____

EMPLOYERS MUTUAL CASUALTY COMPANY, an Iowa corporation,

       Plaintiff,

v.

ARCHITECTURAL CONCEPTS, LLC, a Colorado limited liability company;
EDGAR SIMON CHAVEZ, an individual;
SCOTT COLBY, an individual;
JOSE CARMELO DURON ADAME, an individual;
JOSE CARMELO MARQUEZ, an individual;
JOZETTE SANCHEZ, an individual;
TRUSTILE DOORS, LLC, a Delaware limited liability company,

       Defendants.

---

## COMPLAINT FOR DECLARATORY JUDGMENT

---

Plaintiff, Employers Mutual Casualty Company ("EMC"), by and through its attorney L. Kathleen Chaney with the law firm of Lambdin & Chaney, LLP, for its Complaint for Declaratory Judgment asserts as follows:

### INTRODUCTION

1.      In this insurance-coverage action, EMC seeks a judicial declaration that it has no obligation under its insurance policy to defend, indemnify, or otherwise provide coverage with respect to an action concerning an alleged conspiracy by Architectural Concepts and its employees to steal TruStile's confidential information to illegally compete with it.  The action is *TruStile Doors, LLC v. Architectural Concepts, LLC et al.*, civil action no. 20-cv-1803-WJM-KLM, filed in the United States District Court for the District of Colorado ("Underlying Action").

2.      The plaintiff (TruStile) in the Underlying Action alleges that the other Defendants in this action (identified above) engaged in a nearly two-year-long conspiracy to illegally compete with TruStile, alleging that unbeknownst to TruStile, its trusted employees were working behind the scenes for, and with, a customer turned competitor Defendant Architectural Concepts and its owner Defendant Colby, stealing TruStile's confidential and proprietary information through a stealthy and extensive conspiracy.

3.      Defendant Architectural Concepts, LLC (AC) is the named insured under a Business Protection Policy issued by Plaintiff EMC.  The individually-named Defendants are AC employees who are also defendants in the Underlying Action.  Defendant TruStile is the plaintiff in the Underlying Action.

4.      The factual allegations in the Underlying Action detail the wrongful conduct that occurred months prior to EMC's policy incepting, culminating with the Underlying Action being filed just three months after the EMC policy incepted.

5.      The Business Protection Policy issued by EMC to AC affords no coverage to AC or its employees.  The plaintiff does not allege the defendants are legally obligated to pay covered damages for "bodily injury," "property damage," or "personal and advertising injury," as those terms are defined in the policies; which are not otherwise excluded.  In light of these considerations, the Court should enter a declaratory judgment that the EMC policy affords no coverage for the Underlying Action and that EMC is not obligated to defend or indemnify any of the defendants in the Underlying Action.

## PARTIES, JURISDICTION AND VENUE

6.     Plaintiff EMC is an insurance company incorporated in Iowa with its principal place of business at 717 Mulberry Street, Des Moines, Iowa.  EMC is authorized and licensed to do business in Colorado.

7.     Defendant Architectural Concepts, LLC (AC) is a Colorado limited liability company with its principal executive office address at 18499 Longs Way, Suite 102, Parker, Colorado 80134.

8.     Defendant AC has two members – Scott Colby and Joshua Morgan.  Scott Colby is a citizen of, and domiciled in, California.  Joshua Morgan is a citizen of, and domiciled in, Colorado.  No members of AC are citizens of, or domiciled in, Iowa.

9.     Defendant Edgar Simon Chavez is a citizen of, and domiciled in, Colorado.

10.     Defendant Scott Colby is a citizen of, and domiciled in, California.

11.     Defendant Jose Carmelo Duron Adame is a citizen of, and domiciled in, Colorado.

12.     Defendant Jose Carmelo Marquez is a citizen of, and domiciled in, Colorado.

13.     Defendant Jozette Sanchez is a citizen of, and domiciled in, Colorado.

14.     Defendant TruStile Doors, LLC is a Delaware limited liability company with its principal executive office address at 1780 East 66th Avenue, Denver, Colorado 80229.

15.     The Marvin Companies, Inc. ("Marvin") is the sole member of TruStile. Marvin is a Minnesota corporation with its principal place of business at 401 State Avenue North, Warroad, Minnesota 56763.  TruStile does not have a member who is a citizen of, or domiciled in, Iowa.

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 based on

complete diversity of citizenship and the amount in controversy exceeding $75,000.

17.     Venue is proper under 28 U.S.C. § 1391 because the Defendants reside in this judicial district, because the insurance policy that is the subject of this declaratory judgment action was issued in this judicial district, or because a substantial part of the events giving rise to this action occurred in this judicial district.

## GENERAL ALLEGATIONS

### I.     THE UNDERLYING ACTION

#### A.     The Original Complaint [Doc. 1 in 20-cv-01803]

18.     On June 18, 2020, TruStile Doors, LLC (TruStile) filed a Complaint against Architectural Concepts, LLC, Scott Colby and Jozette Sanchez (the Original Complaint) in the United States District Court for the District of Colorado, Case No. 20-cv-01803-WJM-KLM.  A true and correct copy of the complaint is at *Document #1* in 20-cv-01803, which is incorporated herein by reference, including all exhibits.

19.     The Original Complaint alleges *inter alia* that this is a case about theft, describing the defendants' conduct as shocking and illegal, and stating that the brazen theft and wrongful conduct must stop immediately.  [Doc.1 – Introduction]

20.     The Original Complaint alleges that while employed at TruStile, Defendant Sanchez, who was a long-time trusted member of senior management, abused TruStile's trust and stole TruStile's secrets as part of a scheme to illegally assist her new employer AC, in direct violation of the Employee Proprietary Information and Inventions Agreement (Agreement) that she executed in 2003.  [Doc. 1 – Introduction, ¶¶ 23-37].

21.     Defendant Colby was also a former employee of TruStile from 2001 to 2008, and formed Architectural Concepts, LLC (AC) upon his departure.  [Doc. 1 - ¶¶ 38-41].

22.     AC was a distributor of doors, not a manufacturer.  AC was TruStile's customer, and purchased TruStile products for use in its projects.  [Doc. 1 - ¶¶ 42-43].

23.     In the Spring/Summer of 2019, TruStile learned that AC purchased manufacturing equipment.  [Doc. 1 - ¶ 44].

24.     When directly asked, Defendant Colby represented to TruStile that AC was only going to manufacture mock-up doors (i.e., sample doors), and had no intention to manufacture and sell doors.  [Doc. 1 - ¶¶ 45-47].

25.     AC hired Defendant Sanchez in January 2020, and Sanchez provided notice of her termination on January 15, 2020.  While still employed at TruStile, Defendant Colby encouraged Defendant Sanchez to forward, copy, or otherwise acquire TruStile's confidential, proprietary, trade secret information.  [Doc. 1 - ¶¶ 48-51].

26.     Defendant Sanchez offered, and TruStile accepted, to slowly wind down employment so she could transfer her institutional knowledge to her replacement.  [Doc. 1 - ¶ 52].

27.     During Defendant Sanchez's wind-down, she began forwarding TruStile's confidential, proprietary, trade secret information to her personal iCloud account, jozette.sanchez@icloud.com.  [Doc. 1 - ¶ 53].  In particular:

| | |
|---|---|
| January 15, 2020 | Sanchez emailed an Excel file from her TruStile work email to her personal iCloud account that contained two screenshots related to TruStile's manufacturing resource capacity capabilities, including its daily manufacturing output by resource and TruStile's planned available and planned consumer resource capacity by fiscal week.  [Doc. 1 - ¶ 54]. |
| January 15, 2020 | Sanchez emailed from her work email to her personal iCloud account TruStile's manufacturing packet cover sheets, which |

|  | contain confidential and proprietary details of the products that TruStile is manufacturing on specific days.  [Doc. 1 - ¶ 55]. |
|---|---|
| January 16, 2020 | Sanchez emailed from her work email to her personal iCloud account two documents which contain information about all of the tooling that TruStile uses in the manufacture of its doors, including, but not limited to, details about the tooling, who the tooling is purchased from, and how much TruStile pays for each tool.  [Doc. 1 - ¶ 56]. |
| January 21, 2020 | Sanchez emailed from her work email to her personal iCloud account an AutoCAD file which contains the confidential and proprietary engineering specifications of how TruStile's product is manufactured.  These files constitute trade secrets and could be used by competitors to replicate and "rip off" TruStile's doors.  [Doc. 1 - ¶ 57]. |
| January 21, 2020 | Sanchez emailed from her work email to her personal iCloud account an AutoCAD file that contains TruStile's confidential and proprietary tooling profiles.  These profiles could be used to purchase or create the exact tooling required to replicate TruStile's doors.  [Doc. 1 - ¶ 58]. |
| January 21, 2020 | Sanchez emailed from her work email to her personal iCloud account a 22-page document which contains TruStile's confidential and proprietary operating metrics.  In particular, the document contains a weekly update of TruStile's revenue and manufacturing performance metrics.  [Doc. 1 - ¶ 59]. |
| January 23, 2020 | Sanchez emailed from her work email to her personal iCloud account an Excel spreadsheet containing a list of inventoried parts that TruStile purchased in the first quarter of 2020.  The parts identified in the document represent the vast majority of the inputs for TruStile's finished door product.  The document details the quantities TruStile purchased as well as the supplier from whom the parts were purchased.  [Doc. 1 - ¶ 60]. |

| January 24, 2020 | Sanchez emailed from her work email to her personal iCloud account excerpts from TruStile's Skills Matrix, which details the skills required to reach a certain employment level for TruStile's manufacturing employees; such skill levels correlate to the level of compensation received by TruStile's manufacturing employees.  This information could be used to further poach TruStile's workforce and otherwise determine the skills necessary for each person involved in the door manufacturing process.  [Doc. 1 - ¶ 61]. |
| February 4, 2020 | Sanchez emailed from her work email to her personal iCloud account an updated, more recent version of the operating metrics document that she emailed to her iCloud account on January 21, 2020.  [Doc. 1 - ¶ 62]. |
| February 17, 2020 | Sanchez emailed from her work email to her personal iCloud account TruStile's Access Database, used by TruStile's production planning department to track tooling utilization. Tooling utilization metrics are helpful to prioritize the purchasing of tooling to reproduce TruStile's product based upon utilization volume.  This email filed to deliver to Sanchez's iCloud inbox due to size, the attempt was made.  [Doc. 1 - ¶ 63]. |

28.     All of the documents that Sanchez emailed to her personal iCloud were maintained in the Folder.[1]   All of these documents are confidential and proprietary information owned by TruStile, and TruStile takes reasonable measures to maintain their confidentiality.   All of these documents afford TruStile a competitive advantage and constitute and contain TruStile's trade secrets.  [Doc. 1 - ¶ 64].

29.     Upon information and belief, Colby and AC conspired with Sanchez to steal the confidential, proprietary, and trade secret information that she stole from TruStile.

---

[1] An internal web-based folder titled "Denver Manufacturing Operations, which is only available on TruStile's internal "intranet," and contains TruStile's confidential and proprietary documents.  [Doc. 1 - ¶¶ 14-22].

[Doc. 1 - ¶ 65].

30.    Upon information and belief, Sanchez provided Colby and AC with all of the confidential, proprietary, and trade secret information that she stole from TruStile.  [Doc. 1 - ¶ 66].

31.    During her transitional period, Sanchez maintained the TruStile-issued laptop that was provided to her and maintained access to TruStile's system.  However, following termination of her system access on Mach 17, 2020, TruStile demanded that Sanchez return TruStile's laptop, which she has failed and refused to do.  [Doc. 1 - ¶¶ 68-69].

32.    Further, in March 2020, TruStile spoke, again, with Colby and Colby represented that AC was limiting its production to a small quantity of doors with white laminated glass, because other manufacturers' doors, such as TruStile's, were too expensive.  At that time, TruStile also informed Colby that TruStile's employees have agreements with TruStile that prohibit them from disclosing TruStile's proprietary information and prohibit them from soliciting TruStile's employees.  [Doc. 1 - ¶ 71].

33.    TruStile alleges that Colby and AC are improperly utilizing TruStile's materials and trade dress in specification packages and then commit a bait-and-switch with a competitor's inferior product.  [Doc. 1 - ¶¶ 73-83.].

34.    AC had removed all reference to TruStile in the specification package and indicated that AC was the manufacturer of the doors represented by the TruStile AutoCAD drawings and that VT industries (a competitor of TruStile) was an alternate manufacturer. [Doc. 1 - ¶ 77].

35.    Thus, AC improperly and illegally represented that it was manufacturing

doors with TruStile's trade dress trapezoidal wedge design.  [Doc. 1 - ¶ 78].

36.    Upon information and belief, despite providing numerous customers and potential customers with the product details of TruStile's doors, upon securing the project, AC performs a bait-and-switch and provides the customer with an inferior door, manufactured by a different company, that does not meet TruStile's product specifications.  [Doc. 1 - ¶ 80].

37.    Upon information and belief, as a result of AC's improper conduct, TruStile's trade name and product has been devalued and harmed because it is now being associated with inferior doors.  [Doc. 1 - ¶ 83].

38.    TruStile alleges that AC improperly and illegally copied and otherwise took information from TruStile's website.  [Doc. 1 - ¶¶ 84-106].

39.    AC has improperly and illegally copied images, pictures, phrases/descriptions and other information from TruStile's website and used it on its own website.  [Doc. 1 - ¶ 86].

40.    There are also instances where AC improperly and illegally copied or otherwise took language and images from TruStile's catalogs and used it in its own catalogs and/or on its website.  [Doc. 1 - ¶ 106].

41.    TruStile alleges that Sanchez solicited TruStile's employees in violation of the Agreement.  [Doc. 1 - ¶¶ 107-115].

42.    Upon information and belief, Sanchez, Adame, Chavez, AC, and Colby are utilizing the confidential, proprietary, and trade secret information that Sanchez stole from TruStile to manufacture doors or to prepare to manufacture doors.  [Doc. 1 - ¶ 115].

**B.     First Amended Complaint [Doc. 59 in 20-cv-01803]**

43.     On October 14, 2020, TruStile filed a First Amended Complaint.  A true and correct copy of the First Amended Complaint is at *Document #59* in 20-cv-01803, which is incorporated herein by reference, including all exhibits.

44.     The First Amended Complaint added Jose Carmelo Duron Adame (Duron), Jose Carmelo Marquez (Marquez) and Edgar Simon Chavez (Chavez) as defendants, and also **additional factual allegations**, as set forth below.

45.     In the Introduction [Doc. 59 – Introduction], TruStile alleges:

> TruStile initially thought this case was limited to a single former employee's theft of TruStile's confidential, proprietary information and her partnering with a TruStile competitor to illegally misappropriate TruStile's trade secrets so that they could wrongfully compete with TruStile.  TruStile now recognizes that the conspiracy to transfer its confidential and proprietary information to a competitor was more extensive and enduring than first understood.  Initial discovery and initial disclosures have revealed a nearly two-year-long conspiracy between Defendants to illegally compete with TruStile – both while Sanchez, Duron, Marquez and Chavez were actively employed by TruStile and after.  Sanchez, Duron, Marquez, and Chavez were long-time, trusted employees of TruStile.  However, unbeknownst to TruStile, for almost a year they were working for and with a customer turned competitor, while also working for TruStile.
>
> In particular, Sanchez, Duron, Marquez, and Chavez were working behind the scenes to help AC and Colby compete, and prepare to compete, in the manufacturing of doors.  More specifically, they were assisting AC and Colby to source, purchase, and build equipment for AC to manufacture doors and helping AC to forecast future production based on TruStile's historical door production.  And, they were providing AC and Colby with TruStile's confidential, proprietary, and trade secret information that would help AC unfairly compete with TruStile in the door manufacturing business.  Once the Defendants' door producing capability was close to complete, with the use of TruStile's information, Sanchez, Duron, Marquez, and Chavez one-by-one started providing TruStile with their notice of termination of their employment and, immediately, thereafter, they went to work full-time at AC.  In sum, Defendants orchestrated a

stealthy and extensive conspiracy to take TruStile's information, unfairly duplicate TruStil's success, and ultimately divert and acquire TruStile's business as well as its future prospects.

46.     Throughout their employment, Sanchez, Duron, Chavez and Marquez were provided access to TruStile's competitively advantageous product specifications, engineering specifications, and the other contents of the Folder, which are trade secrets and contain otherwise confidential and proprietary trade secret information belonging to TruStile.  [Doc. 59 - ¶ 45].

47.     In addition, in April 2019, upon Colby's request, Sanchez emailed Colby the Sanchez Agreement [Employee Proprietary Information and Inventions Agreement].  [Doc. 59 - ¶ 51].

48.     Upon information and belief, in or about November or December 2018 Colby and AC began soliciting TruStile's employees to work for AC.  [Doc. 59 - ¶ 63].

49.     Upon information and belief, between November 2018 and the Spring of 2019, Sanchez, Duron, Marquez, and Chavez all agreed to work for or otherwise be engaged by AC despite still being employed by TruStile.  [Doc. 59 - ¶ 66].

50.      Sanchez, Duron, Marquez, and Chavez began working for AC without TruStile's knowledge or consent.  Sanchez, Duron, Marquez, and Chavez, acting in concert, actively concealed from TruStile the fact that they were working for AC, providing AC with TruStile's confidential information, and otherwise assisting AC to compete, or prepare to compete, with TruStile.  [Doc. 59 - ¶ 67].

51.     In the Spring of 2019, Sanchez, Duron, Marquez, and Chavez began working with AC and Colby to source, purchase, and build equipment for AC to manufacture doors.  [Doc. 59 - ¶ 68].

11

52.     For instance, starting in the Spring of 2019, and through the beginning of 2020, Sanchez, Duron, Marquez, and Chavez began working with AC and Colby to source, purchase, and/or build equipment for AC's manufacturing of doors including, but not limited to: computer numerical control (CNC) machines, saws, door rotary machines, material presses, parts carts, tooling machines, welders, pre-finish lines, glue pumps, lamination presses, and assembly racks.  [Doc. 59 - ¶ 69].

53.     They also provided Colby and AC with information regarding potential production volumes, based on TruStile's production volumes, so that AC could prepare its long-term production forecasts and compete with TruStile.  [Doc. 59 - ¶ 70].

54.     At or around the same time, Sanchez began working with Colby and AC's software developer, IMOS Service, to create the software for AC to manufacture doors. [Doc. 59 - ¶ 71].

55.     On or about April 5, 2019, Sanchez emailed Colby, from her personal iCloud account, TruStile's confidential, proprietary, and trade secret "Week 13 2019 Operating Metrics" which, upon information and belief, was used by AC and Colby to unlawfully gain intel on TruStile's product order and sales channel scaling and general business performance. This information is not circulated or otherwise provided outside of TruStile. [Doc. 59 - ¶ 72].

56.     On or about May 2, 2019, Sanchez emailed Colby, from her personal iCloud account, TruStile's confidential and proprietary "Part Master" which is a list of all materials and goods purchased or inventories by TruStile. This information is not circulated or otherwise provided outside of TruStile.  [Doc. 59 - ¶ 73].

57.     On or about June 4, 2019, Sanchez emailed Colby, from her personal iCloud account, AutoCAD files of TruStile's confidential, proprietary, and trade secret cross section drawings that are maintained in the Folder. In response to receiving such information Colby said, "This is Perfect," and Sanchez responded, "Sweet."  [Doc. 59 - ¶ 74].

58.     On or about June 12, 2019, Sanchez emailed Colby, from her personal iCloud account, AutoCAD files detailing TruStile's confidential, proprietary, and trade secret product rules for the dimensions of parts required for manufacturing. Such information is maintained in the Folder.  [Doc. 59 - ¶ 75].

59.     After Sanchez provided Colby with this trade secret information belonging to TruStile, they emailed each other, as follows [Doc. 59 - ¶ 76]:

> Colby: "Thanks Josie, I will look at today."
> Colby: "This is awesome!"
> Sanchez: "I am the superstar lol"
> Colby: "Yes you are…"

60.     Defendants concealed their bad acts from TruStile. By way of example, Colby made sure that venders of AC, which interacted with Sanchez, knew not to contact her through her TruStile email address. On July 20, 2019, Colby emailed a company that provides advanced woodworking machinery and technology solutions and told them to "Please make sure you are using Jozette's correct email address. It is not the TruStile email. Jozette Sanchez jozette.sanchez@icloud.com."  [Doc. 59 - ¶ 77].

61.     On August 5, 2019, Sanchez emailed Colby a copy of TruStile's confidential, proprietary, and trade secret fire listing lookup. The fire listing lookup is a tool developed internally by TruStile to determine what type of fire core is required based on

TruStile's confidential fire listings and related product design rules. Such information is not circulated or otherwise provided outside of TruStile.  [Doc. 59 - ¶ 78].

62.     On August 9, 2019, Sanchez emailed Colby TruStile's confidential, proprietary, and trade secret certification report which certified that the design and construction of TruStile's door satisfies the commercial construction requirements to classify as a 20-minute fire door. Such information is not circulated or otherwise provided outside of TruStile and is held confidential by the third-party testing agency.  [Doc. 59 - ¶ 79].

63.     Sanchez did not have a legitimate business reason to send Colby any of the foregoing TruStile information and files and did so for the transparent purpose of misappropriating and stealing TruStile's information and otherwise wrongfully assisting AC in illegally competing with TruStile.  [Doc. 59 - ¶ 80].

64.     On or about August 27, 2019, Duron, Marquez, and Chavez met with Colby and Joshua Morgan for lunch, visited the property of a potential new manufacturing facility for AC, and met with AC's bankers regarding AC's door manufacturing.  [Doc. 59 - ¶ 81].

65.     While still employed by TruStile, and unbeknownst to TruStile, in November 2019, on behalf of and at the direction of AC, Chavez attended a week long CAM training in Michigan. Chavez was paid by AC for attending this training.  [Doc. 59 - ¶ 82].

66.     Colby, AC, Sanchez, Duron, Marquez, and Chavez conspired to take TruStile's confidential, proprietary, and trade secret information and to unlawfully compete with TruStile.  [Doc. 59 - ¶ 83].

67.     TruStile asserts the following causes of action:

     I.     Breach of Contract against Sanchez, Duron, and Chavez;
    II.     Tortious Interference with Contract against AC, Colby and Sanchez;

III.    Civil Theft against AC and Sanchez;

IV.    Unjust Enrichment against AC and Sanchez;

V.    Misappropriation of Trade Secrets under C.R.S. § 7-74-101 against AC and Sanchez;

VI.    Breach of Duty of Loyalty against Sanchez, Duron, Chavez and Marquez;

VII.    Unfair Competition based on False Representations in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) against AC;

VIII.    Trade Dress Infringement under 15 U.S.C. § 1125(a) against AC;

IX.    Misappropriation of Trade Secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 against AC and Sanchez;

X.    Conversion against Sanchez;

XI.    Aiding and abetting breach of fiduciary duty/duty of loyalty against AC and Colby;

XII.    Civil Conspiracy against all Defendants; and,

XIII.    Exemplary Damages under C.R.S. § 13-21-102 against AC and Colby.

68.    On October 30, 2020, TruStile filed its Motion for Leave to Request Exemplary Damages in TruStile Doors, LLC's Amended Complaint, [Doc. 67], which is incorporated herein by reference, including all exhibits.

69.    In support of adding a punitive damages claim to the Amended Complaint, TruStile asserts: "Defendants in this case are remarkable, and not in a good way.  Four recent employees of TruStile have been caught illegally competing with TruStile by joining a competitor and assisting that competitor (AC) in stealing TruStile's trade secrets and other confidential and proprietary information and otherwise working for AC while at the same time collecting a paycheck from TruStile.  This was all done with the express knowledge and encouragement of AC and Colby.  This is not a case of good old-fashioned competition; this is corporate espionage, plain and simple."  [Doc. 67, pp.13-14].

70.    On March 3, 2021, TruStile filed its Supplementation of Record in Support of Its Motion for Leave to Request Exemplary Damages in TruStile Doors, LLC's Amended Complaint, [Doc. 94], which is incorporated herein by reference, including all exhibits.

71.     On March 22, 2021, TruStile filed its Second Supplementation of Record in Support of Its Motion for Leave to Request Exemplary Damages in TruStile Doors, LLC's Amended Complaint, [Doc. 98], which is incorporated herein by reference, including all exhibits.

## II.     THE POLICY

72.     EMC issued Business Protection Policy 6x1-72-20---21 to named insured Architectural Concepts, LLC at 18499 Longs Way, Unit 102, Parker, CO 80134-9030, with a policy period of March 1, 2020 to March 1, 2021 (the Policy). *Attached as **Exhibit 1.***

73.     The Policy was new business and not a renewing policy. By the time EMC's policy first incepted, the conspiracy had been going on for months and the theft of TruStile's information had already occurred.

74.     The Policy consists of Coverage Parts for Liability, Automobile and Umbrella Coverage. ***Exh 1, p.2.***

### A.     Provisions in the Liability Coverage Part

75.     The Liability Coverage Part has an "Each Occurrence Limit" of $1,000,000, a "Personal and Advertising Injury Limit" of $1,000,000, and a "General Aggregate Limit" of $2,000,000. ***Exh 1, p.6.***

76.     The Liability Coverage Part includes a Commercial General Liability Coverage (CGL) Coverage Form, with the following Coverage A provisions ***Exh. 1, pp.15-16***:

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

### 1.     Insuring Agreement

    **a.**     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage"

16

to which this insurance applies.  We will have the right and duty to defend that insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

***

**b.**     This insurance applies to "bodily injury" and "property damage" only if:

***

**(1)**    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)**    The "bodily injury" or "property damage" occurs during the policy period; and

**(3)**    Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred in whole or in part. If such listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**2.**     **Exclusions**

This insurance does not apply to:

**a.**     **Expected Or Intended Injury[2]**

"Bodily injury" or "property damage" expected or intended from the standpoint of an insured.  This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

---

[2] As amended by endorsement **GENERAL LIABILITY ELITE EXTENSION**, CG7578(2-19), *Exh. 1, p.43*.

77.　　The CGL Coverage Form includes the following Coverage B provisions

***Exh. 1***, *pp.20-22:*

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1.　　Insuring Agreement**

    **a.**　　We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to this insurance does not apply.  We may, at our discretion, investigate any offense and settle any claim or "suit" that may result.

***

    **b.**　　This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2.　　Exclusions**

This insurance does not apply to:

    **a.　　Knowing Violation Of Rights Of Another**

    "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

    **b.　　Material Published With Knowledge Of Falsity**

    "Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

    **c.　　Material Published Prior To Policy Period**

    "Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

***

    **f.**    **Breach Of Contract**

"Personal and advertising injury" arising out a breach of contract, except an implied contract to use another's advertising idea in your "advertisement."

    **g.**    **Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

\*\*\*

    **i.**    **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.  Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

\*\*\*

    **l.**    **Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out the unauthorized use of another's name or product in your email address, monain name or metatag, or any other similar tactics to mislead another's potential customers.

78.    The CGL Coverage Form includes the following **SECTION V – DEFINITIONS,** *Exh. 1, pp.27-29*:

    **1.**    "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.  For the purposes of this definition:

    **a.**    Notices that are published include material placed on the Internet or on similar electronic means of communication; or

    **b.**    Regarding web sites, only that part of a web site that is about your

19

goods, products or services for the purposes of attracting customers or supports is considered an advertisement.

**3.**   "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**13.**   "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.**   "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    **a.**   False arrest, detention or imprisonment;

    **b.**   Malicious prosecution;

    **c.**   The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, by or on behalf of its owner, landlord or lessor;

    **d.**   Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    **e.**   Oral or written publication of material that violates a person's right of privacy;

    **f.**   The use of another's advertising idea in your "advertisements"; or

    **g.**   Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**17.**   "Property damage" means:

    **a.**   Physical injury to tangible property, including all resulting loss of use pf that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    **b.**   Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

**B.     Provisions in the Umbrella Coverage Part**

79.     The Umbrella Coverage Part has an "Each Occurrence Limit" of $5,000,000, a "Personal and Advertising Injury Limit" of $5,000,000, and an "Aggregate Limit" of $5,000,000.  ***Exh. 1, p.99.***

80.     The Umbrella Coverage Part includes a Commercial Liability Umbrella Coverage Form, which contains provisions materially identical for present purposes to the pertinent provisions of the Liability Coverage Part.  ***Exh. 1, pp.0106-0123.***

**III.    THE CLAIM**

81.     EMC is currently providing a defense to the defendants in the Underlying Action under a reservation of rights.

82.     The allegations in the Underlying Action either do not trigger an insuring agreement or are otherwise excluded.

83.     EMC therefore is seeking a judicial declaration that it has no duty to provide a defense or indemnification with respect to the Underlying Action.

**CLAIM FOR RELIEF: DECLARATORY JUDGMENT**

84.     EMC incorporates the above paragraphs as if set forth in full herein.

85.     This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 for the purpose of determining a real, substantial, and justifiable issue in controversy between the parties hereto with respect to insurance coverage under the Policy.

86.     EMC requests that the Court determine that EMC has no obligation under the Policy to defend, indemnify, or otherwise provide coverage with respect to the Underlying Action.

87.     Specifically, EMC requests a judicial determination: (i) that the Underlying

Action does not seek damages because of "bodily injury" or "property damage" caused by an "occurrence" under Coverage A of the CGL or Umbrella Coverage Forms; and (ii) even if they did, that the exclusion for "Expected Or Intended Injury" bars any duty to defend or indemnify.

88.     EMC also requests a judicial determination: (i) that the Underlying Action does not seek damages because of "personal and advertising injury" under Coverage B of the CGL or Umbrella Coverage Forms; and (ii) even if damages for "personal and advertising injury" were at issue, the Policy's exclusions for "Knowing Violation of Rights of Another," "Material Published With Knowledge Of Falsity," "Material Published Prior To Policy Period," "Breach of Contract," "Quality Or Performance Of Goods – Failure To Conform to Statements," " Infringement Of Copyright, Patent, Trademark Or Trade Secret," and/or "Unauthorized Use Of Another's Name Or Product" bar any duty to defend or indemnify.

89.     A judicial determination is necessary and appropriate at this time under the circumstances in order that the parties may ascertain their rights and duties under the Policy.

## CONCLUSION

WHEREFORE, EMC prays for a judgment as follows:

90.     An order of the Court, declaring, adjudicating, decreeing, and clarifying the rights and responsibilities of EMC and the Defendants, and each of them, as follows:

> That EMC has no obligation under the Policy to defend, indemnify, or otherwise provide coverage with respect to the following civil action: *TruStile, LLC v. Architectural Concepts, LLC et al.*, No. 20-cv-01803-WJM-KLM (D. Colo).

91.     An award of costs and attorney fees as permitted by applicable law.

92.     Such other and further relief as the Court may deem proper.

Dated June 1, 2021.

Respectfully submitted.


s/  *L. Kathleen Chaney*
L. Kathleen Chaney
LAMBDIN & CHANEY, LLP
4949 South Syracuse Street, Suite 600
Denver, CO 80237
(303) 799-8889
(303) 799-3700 (facsimile)
Email:  kchaney@lclaw.net
*Attorneys for the Plaintiff*